UNITED STATES, Appellee,

v.

Kevan FULMER, Defendant—Appellant.

No. 96–1331.

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1996.

Decided March 28, 1997.

lowed by two years of supervised release. On appeal, Fulmer challenges his conviction, a number of evidentiary rulings, and the jury instructions. We find that several improper evidentiary rulings were not harmless error, and, accordingly, we vacate Fulmer's conviction and remand for a new trial.

## BACKGROUND

We sketch the facts presented at trial, providing further details as they become relevant to the discussion. In May 1994, the Office of the United States Trustee referred to Egan a complaint in which Fulmer alleged that his former father-in-law, Antonio Boschetti ("Boschetti"), and his brother, David Fulmer, had failed to disclose assets in bankruptcy and had committed pension fraud and income tax fraud. Egan arranged to meet Fulmer in August or September of 1994. At the meeting, Fulmer explained to Egan that he and his brother had married Boschetti's daughters, and that Fulmer had since been divorced. Fulmer indicated that Boschetti and David Fulmer had engaged in illegal business activities. Fulmer explained that these were "vicious" people and that they had "used the courts to keep him away from his family." Egan described Fulmer's demeanor as "polite, articulate" and "tense." Egan noted that, although he tried repeatedly to steer the conversation toward the alleged concealment of assets, Fulmer would return to his strained relationship with his family.

Over the next three months, Fulmer contacted Egan "every week or ten days." Fulmer delivered documents to Egan's office and stopped by to inquire about the investigation. Fulmer also sent letters and faxes to Egan and called Egan on the telephone, leaving messages when he did not reach Egan. Throughout this interaction, Fulmer continued to comment on his poor relationship with his family.

Egan interviewed Boschetti and David Fulmer, and obtained and reviewed documents related to the bankruptcy. After Egan investigated Fulmer's allegations, Egan consulted with an Assistant United States Attorney. In January 1995, the United States Attorney's office advised Egan that

Miriam Conrad, Federal Defender Office, for appellant.

Paul G. Levenson, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief, for appellee.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

TORRUELLA, Chief Judge.

On April 28, 1995, DefendantAppellant Kevan Fulmer ("Fulmer") was indicted for threatening a federal agent in violation of 18 U.S.C. § 115(a)(1)(B). Following a jury trial, Fulmer was convicted on November 3, 1995, of threatening Richard Egan ("Egan"), a special agent with the Federal Bureau of Investigation ("FBI"). Fulmer was sentenced to a term of five months imprisonment to be fol-

it would not prosecute the case. Egan in turn informed Fulmer that the records did not support prosecution. Fulmer protested the decision, but said "good-bye" and hung up after Egan told him there was nothing further to discuss. Fulmer may have asked Egan whether he could provide further information to make a stronger case against Boschetti and David Fulmer.

There were no further interactions between Egan and Fulmer until April 25, 1995, when Egan received the following voicemail message from Fulmer at approximately 5:40 p.m.:

> Hi Dick, Kevan Fulmer. Hope things are well, hope you had an enjoyable Easter and all the other holidays since I've spoken with you last. I want you to look something up. It's known as misprision. Just think of it in terms of misprision of a felony. Hope all is well. The silver bullets are coming. I'll talk to you. Enjoy the intriguing unraveling of what I said to you. Talk to you, Dick. It's been a pleasure. Take care.

At Fulmer's trial, Egan testified that he was "shocked" by the message, which he found "chilling" and "scary." He testified that he had never heard the term "silver bullets" before and believed that the term indicated a threat. He stated that he intended to report the message to the United States Attorney's office. Egan's supervisor, Robert Schlabach, testified that Egan played the message for him the next morning and told Schlabach that he believed the message was a threat and intended to take it to the United States Attorney's office. Schlabach also testified that Egan appeared "clearly upset, concerned, [and] agitated." Trial Transcript, vol. 2, at 130.

Fulmer presented two witnesses who testified to the meaning Fulmer associated with the term "silver bullets." The first, John Noonan, a lawyer and former federal investigator, testified that he had heard Fulmer use the phrase "silver bullets" to describe "a clear-cut simple violation of law." Noonan stated that Fulmer used the phrase to describe specific evidence, including an $8,200 check from a bankruptcy estate that never reached its intended recipient.

The second witness, David Tremblay, testified that he had known Fulmer for more than twenty years and that Fulmer had used the phrase "silver bullets" to mean "information that he was going to provide to banks proving the illegality of some of David Fulmer's transactions."

David Baarlaer, a portfolio analyst for GE Capital, testified that in April 1995 Fulmer prompted Baarlaer to investigate whether GE Capital had received a check for approximately $8,300 from the Boschettis. Baarlaer found that the check had not been received. In April, David Fulmer sent Baarlaer a copy of the check, which showed no signs of having been canceled, endorsed, or deposited. Sometime before April 25, 1995, Baarlaer told Fulmer about the check.

## DISCUSSION

### I. Sufficiency of the Evidence

Fulmer contests the sufficiency of the evidence supporting his conviction on two grounds, first, that an ambiguous statement cannot be considered a "true threat," and second, that the evidence did not support a finding that Fulmer had the requisite intent. We begin with the now-familiar standard of review:

> In assessing a challenge to the sufficiency of the evidence, we "review the record to determine whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt that the defendant [was] guilty as charged."

*United States v. Sullivan,* 85 F.3d 743, 747 (1st Cir.1996) (quoting *United States v. Mena–Robles,* 4 F.3d 1026, 1031 (1st Cir. 1993)).

### A. "True threat"

Fulmer argues that the appropriate standard for determining a true threat is whether "a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to

harm or assault." *United States v. Orozco-Santillan,* 903 F.2d 1262, 1265 (9th Cir.1990). The government argues that the proper standard is whether an "ordinary, reasonable recipient who is familiar with the context of the [statement] would interpret it as a threat of injury." *United States v. Maisonet,* 484 F.2d 1356, 1358 (4th Cir.1973). This circuit has not yet ruled on the appropriate standard regarding the nature of a "true threat." Although our sister circuits that have reviewed the standard under this and other[1] federal threat statutes agree that an objective standard is required, they disagree regarding the appropriate vantage point—what a person making the statement should have reasonably foreseen or what a reasonable person receiving the statement would believe. *Compare United States v. Malik,* 16 F.3d 45, 48 (2d Cir.1994) ("The test is an objective one—namely, whether 'an ordinary, reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury.'" (quoting *Maisonet,* 484 F.2d at 1358)), *and United States v. Schneider,* 910 F.2d 1569, 1570 (7th Cir.1990) ("The test for whether a statement is a threat is an objective one; it is not what the defendant intended but whether the recipient could reasonably have regarded the defendant's statement as a threat.") *with Orozco-Santillan,* 903 F.2d at 1265 ("Whether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault.") *and United States v. Welch,* 745 F.2d 614, 619 (10th Cir.1984) (maintaining that the test is "whether a reasonable person would foresee that the statement would be interpreted by persons hearing it as a serious expression of an intention to inflict bodily harm upon or to take the life of the President of the United States." (internal quotations omitted)). *See also United States v. DeAndino,* 958 F.2d 146, 148 (6th Cir.1992) ("[T]he standard ... is an objective standard, *i.e.,* would a reasonable person consider the statement to be a threat.").

■ We believe that the appropriate standard under which a defendant may be convicted for making a threat is whether he should have reasonably foreseen that the statement he uttered would be taken as a threat by those to whom it is made. This standard not only takes into account the factual context in which the statement was made, but also better avoids the perils that inhere in the "reasonable-recipient standard," namely that the jury will consider the unique sensitivity of the recipient. We find it particularly untenable that, were we to apply a standard guided from the perspective of the recipient, a defendant may be convicted for making an ambiguous statement that the recipient may find threatening because of events not within the knowledge of the defendant. Therefore, we follow the approach of several circuits by holding that the appropri-

---

1. 18 U.S.C. § 871 provides, in part:
 Threats against President and successors to the Presidency
 (a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 875 provides, in part:
 Interstate communications
 (c) Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.
18 U.S.C. § 876 provides, in part:
 Mailing threatening communication
 Whoever knowingly so deposits or causes to be delivered as aforesaid, any communication with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to kidnap any person or any threat to injure the person of the addressee or of another, shall be fined under this title or imprisoned not more than five years, or both.

ate focus is on what the defendant reasonably should have foreseen.

■ Fulmer contends that the statement was at most ambiguous and could not have been a "true threat." Fulmer cites *United States v. Andújar*, which states that

> [i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction. This is so because ... where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the verdict, a reasonable jury must necessarily entertain a reasonable doubt.

49 F.3d 16, 20 (1st Cir.1995) (citation, internal quotation marks, and emphasis omitted).

■ Although Fulmer properly recites the law, we find that *Andújar*'s wisdom does not apply here. A reasonable jury could have found the following. A bankruptcy trustee referred Fulmer's complaint to Egan in May 1994. In August or September, Egan met with Fulmer, and found his demeanor regarding his family "intense." Fulmer expressed his belief that Boschetti and David Fulmer had engaged in illegal activities and further claimed that they were "vicious" people who had used the courts to keep Fulmer away from his family. Thereafter, Egan had conversations with Boschetti and David Fulmer who reiterated the ill feelings Fulmer bore toward them. Fulmer contacted Egan frequently, by letter and by telephone, leaving voicemail messages when Egan was not available.

After a thorough investigation, Egan and an Assistant United States Attorney determined that the evidence was insufficient to support a prosecution. Fulmer protested, but when Egan told him there was nothing further to discuss, he said "goodbye" and hung up. Egan's next interaction with Fulmer occurred three months later, when Fulmer left the voicemail message at issue.

The jury could have also found that, although the usage of the term "silver bullets" varies, the phrase may be used as a threat.

■ Reviewing all of these facts, and drawing all inferences in favor of the verdict, we cannot say that no rational jury could have found beyond a reasonable doubt that Fulmer's statement was a threat. "Whether a given [statement] constitutes a threat is an issue of fact for the trial jury." *Malik*, 16 F.3d at 49. The use of ambiguous language does not preclude a statement from being a threat. *See id.; Schneider*, 910 F.2d at 1570 ("The threat in this case was ambiguous, but the task of interpretation was for the jury."); *Orozco–Santillan*, 903 F.2d at 1265 ("The fact that a threat is subtle does not make it less of a threat." (citation and quotation marks omitted)); *Maisonet*, 484 F.2d at 1358 (finding determination of whether statement constitutes a threat a jury question); *see also United States v. Barcley*, 452 F.2d 930, 934 (8th Cir.1971) (Aldrich, J., sitting by designation, dissenting) (contending that the interpretation of an ambiguous statement is a factual question to be resolved by a jury). While the statement on its face may be susceptible to more than one interpretation, some factors not discernable from the record, such as the tone of the defendant's voice or the credibility of the government's and Fulmer's witnesses, may legitimately lead a rational jury to find that this statement was a threat.

■ Fulmer further suggests that we must strictly apply the "true threat" standard in order to avoid trampling on his First Amendment rights, citing *Watts v. United States*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). *Watts* involved a statement made against the president in the context of a political rally against a war. The Court was concerned with punishing Watts' constitutionally protected political speech. *See id.* at 706–08, 89 S.Ct. at 1401 ("The language of the political arena, like the language used in labor disputes, ... is often vituperative, abusive and inexact.... Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise."). In this case, Fulmer does not argue his message was one criticizing either Egan or any other government figure. Moreover, a true threat is

unprotected by the First Amendment. *Orozco–Santillan*, 903 F.2d at 1265. Thus, a conviction under this statute, based on a finding that the statement was a true threat, would not violate Fulmer's constitutionally protected right to speech.

### B. Intent to impede, intimidate, interfere with, or retaliate

■ The jury was entitled to infer Fulmer's intent from the circumstances surrounding the statement. *See United States v. DiMarzo*, 80 F.3d 656, 661 (1st Cir.) ("The jury was entitled to rely upon circumstantial evidence . . . to infer essential elements of the crime . . . ."), *cert. denied,* —— U.S. ——, 117 S.Ct. 259, 136 L.Ed.2d 185 (1996); *United States v. Taylor*, 54 F.3d 967, 975 (1st Cir.1995) (noting that a showing of criminal intent "may be made wholly on the basis of circumstantial evidence"). Drawing all inferences and credibility determinations in favor of the government's case, we find that a rational jury could have found that Fulmer knowingly made the statement alleged to be a threat, and that he did so with the intent to "impede, intimidate, or interfere with" Egan in the performance of his duties, or to "retaliate" against him, within the meaning of 18 U.S.C. § 115(a)(1)(B).

Although we find that the evidence was not insufficient as a matter of law, we come to this conclusion by viewing the properly admitted evidence in the light most favorable to the verdict and by drawing all credibility determinations in favor of the verdict. As we discuss in section III, we believe that the improperly admitted evidence was so inflammatory that it may have prompted the jury at the outset to weigh the properly admitted evidence in the government's favor. This sort of taint we cannot condone, and justifies a reversal even where Fulmer's argument as to the sufficiency of the evidence fails.

## II. Jury Instructions

### A. Intent to Threaten Egan

Fulmer argues that the district court erred when it failed to instruct the jury that the statute requires both the statutory intent and an intent "to put Mr. Egan in fear of being assaulted or murdered." He also claims that the district court erred when it declined to instruct "to say or do something that would cause a person of ordinary sensibilities to be fearful of harm to himself or another."

The district court set forth the jury instruction regarding the elements of the statute [2] as follows:

> To prove the defendant committed this crime, the Government must prove that the defendant knowingly threatened the officer. The term "knowingly," as used in these instructions, means that the defendant was conscious and aware of his actions, realized what he was doing, and did not act out of ignorance, mistake, or accident.

> Now, what is a threat for purposes of this statute? A threat is a statement that expresses an intent to inflict bodily harm on someone. To be a threat, a statement must be of such a nature as can reasonably induce fear. You must determine whether a statement was a true threat when judged in this context—in its context.

> Among other things, you should consider whether on its face and in the circumstances in which the statement is made, a reasonable person would foresee that the statement would convey to the recipient a seriousness of purpose and the apparent prospect of execution. Whether a particular statement is a threat is governed by an objective standard whether a reasonable person in the circumstances would foresee that the statement would be interpreted by the person to whom it is made as a serious expression of intent to harm or assault.

---

2. 18 U.S.C. § 115(a)(1)(B) states:
 (a)(1) Whoever—
 \* \* \* \* \* \*
 (B) threatens to assault, kidnap, or murder, a United States official, judge, a Federal law enforcement officer, or an official whose killing would be a crime under such section,

with intent to impede, intimidate, or interfere with such official, judge, or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such person on account of the performance of official duties during the term of service of such person, shall be punished. . . .

This means that you should consider the statement in light of its entire factual context, including the surrounding events, reaction of the listeners, and the manner and tone in which it is made—was made. Sometimes the tone or the way something is expressed can make a difference between a threat and something that is not a threat.

Keep in mind that the Government must prove its case beyond a reasonable doubt. So if there is something ambiguous about the way the statement is made and you think that the statement can be reasonably interpreted under the circumstances, either as threatening or nonthreatening, the case has not been proven. However, the fact that a threat is subtle or lacks explicitly threatening language does not make it less of a threat.

Now, a threat can be made in person, in a phone call, or in a letter. To be a threat, it's not necessary that the statement be made face to face. The Government does not have to prove that the defendant actually intended to carry out the threat or that he was able to. That is not a part of the definition of threat.

If the Government proves that a threat was made by the defendant, then you must decide whether the person threatened was a federal law enforcement officer and whether at the time the threat was made, the officer was engaged in the performance of his official duties.

\* \* \* \* \* \*

If you find that a threat to assault or murder a federal law enforcement officer was made, then you must consider the next element of the offense. The indictment says that the threat was made with intent to impede, intimidate, and interfere with Agent Egan while engaged in the performance of his official duties and to retaliate against him on account of the performance of those duties.

Even though the indictment uses the word "and," you must determine whether the defendant made the threat with the intent to impede or intimidate or interfere with the federal law enforcement officer's performance of his other official duties or whether the defendant made the threat with the intent to retaliate against the law enforcement officer because of his performance of his official duties.

The Government may satisfy this element of the offense by proving any of these intentions. It is not necessary that the Government prove that the defendant intended all of these things. If you find that the Government has proven any of these intentions beyond a reasonable doubt and you agree unanimously as to which one it is, then the Government would have proven the element of intent.

When we talk about a defendant's—about the defendant's intent, we are talking about what he meant to do and what was in his mind. This is difficult to prove directly, because there is no way directly to scrutinize the works of someone else's mind or his state of mind. But you may infer ... the defendant's intent from the surrounding circumstances, that is to say, you may rely on circumstantial evidence in determining the defendant's intent. You may consider any statement made, act done, or omitted by the defendant and all other facts and circumstances in evidence which indicate his intent.

Trial Transcript, vol. 4, at 84–87.

■ "We review allegedly erroneous jury instructions *de novo* to determine [whether] the instructions, taken as a whole, show a tendency to confuse or mislead the jury with respect to the applicable principles of law." *Tatro v. Kervin,* 41 F.3d 9, 14 (1st Cir.1994).

■ We find that the instructions, in their entirety, accurately reflect the elements, including the required intent, necessary to convict under 18 U.S.C. § 115(a)(1)(B). "The only intent requirement is that the defendant intentionally or knowingly communicates his threat, not that he intended or was able to carry out his threat." *Orozco–Santillan,* 903 F.2d at 1265 n. 3. The district court's instruction accurately reflects this standard and, thus, there was no error.

■ Regarding Fulmer's contention that the district court erred in failing to adopt

Fulmer's definition of "intimidate," we note that his trial counsel failed to state an objection to the definition of "intimidate." Therefore, we review only for plain error. *Andújar*, 49 F.3d at 22.

■ Beyond stating that the court did not include this instruction, Fulmer fails to state why this omission would constitute error. We believe that the meaning of the word "intimidate" is not outside of the juror's understanding such that the district court's failure to define the word could constitute an error that threatens to "undermine the fundamental fairness of the trial." *United States v. Josleyn*, 99 F.3d 1182, 1197 (1st Cir.1996) (citing *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). We thus find no plain error here.

## B. Definition of "threat"

Fulmer states his objections to the district court's definition of threat as:

1) to the absence of an instruction that a threat is "a serious expression of intent to inflict injury and not merely a vehement or emotional expression of political opinion, hyperbole, or arguments against Government officials"; 2) that the instruction should not define a threat as an expression of intent to *harm* or assault, since the threat charged was one to assault or murder; 3) to the phrase "reasonably induce fear"; 4) to the instruction that the tone could make the difference between a threat and a nonthreatening statement; and 5) to the instruction that the absence of explicitly threatening language or the use of subtle words does not make a statement less of a threat.

Appellant's Brief at 44–45.

■ Regarding Fulmer's first argument, that an instruction that the statement was not "merely . . . arguments against a government official," exclusion of this language was proper. Although a defendant is entitled to an instruction on a defense theory that is "sufficiently supported by both the evidence and the law," *United States v. Olmstead*, 832 F.2d 642, 647 (1st Cir.1987), there is no evidence in the record to support a theory that Fulmer intended any statement

in this message to register his displeasure with the manner in which Egan was conducting his official duties. No such argument was presented to the jury in Fulmer's closing arguments. Furthermore, the statutory requirement of an intent to impede, intimidate, or interfere with, or to retaliate against a federal law enforcement officer "serves to insulate the statute from unconstitutional application to protect speech." *United States v. Gilbert*, 813 F.2d 1523, 1529 (9th Cir.1987). We find that there is a risk that including such language would serve to confuse the jury in its review of the facts in the case and its exclusion was not error.

■ Fulmer next argues that the district court's instruction that a threat could mean an intent to harm creates a risk that the jury would convict Fulmer for making a "threat of nonphysical harm, such as harm to the agent's reputation or career." Appellant's Brief at 46. Fulmer's argument obfuscates the actual instruction, which creates no such risk. The court instructed that "[a] threat is a statement that expresses an intent to inflict bodily harm on someone." The district court's limitation of the jury's attention to only *bodily* harm protects Fulmer from the situation against which he protests. There was no error in the district court's use of the word "harm" to define "threat."

Fulmer fails to present any further argument, let alone developed argument, regarding the term "reasonably induce fear," and thus the argument is waived. *See United States v. Tracy*, 989 F.2d 1279, 1286 (1st Cir.1993) ("It is well settled that issues are deemed waived when 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation.'") (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990)).

■ Fulmer's next two contentions, that the court's "emphasis" on tone diminished the standard of proof, and that the court's instruction that the absence of explicitly threatening language or the use of subtle language does not rule out a finding of a true threat misstates the law, are without support. Where a statement may be ambiguous, the entire context, including the tone used,

may assist the jury in determining whether that ambiguous statement was a threat. *See Malik*, 16 F.3d at 50 ("[R]igid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render the statute powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat."); *see also United States v. Sciolino*, 505 F.2d 586, 588 (2d Cir.1974) ("Since the question of whether subtle conduct can amount to a threat of force depends greatly upon all of the surrounding circumstances, including not only the words used but the facial expressions and gestures of the accused, it is peculiarly one for resolution by the jury."). There was nothing improper with so instructing the jury, and, given the district court's repeated admonitions that the jury must find all of the elements beyond a reasonable doubt in order to convict Fulmer, to do so did not diminish the standard the jury was required to apply.

### C. Supplemental instruction on "assault"

■ Fulmer's final argument is that the district court's supplemental jury instruction defining assault "tended to confuse or mislead the jury on the controlling issues." *United States v. Alzanki*, 54 F.3d 994, 1001 (1st Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 909, 133 L.Ed.2d 841 (1996). "[T]he giving, or withholding, of a supplemental instruction, or the contents of it if given, are matters committed to the trial court's sound discretion." *United States v. Parent*, 954 F.2d 23, 25 (1st Cir.1992).

A few hours into their deliberations, the jury sent a note to the district judge stating, "We have would [sic] like a definition of the word 'assault' used in the complaint or legal definition." After a bench conference on the appropriate definition, the district court instructed the jury, over Fulmer's objection, that assault means:

any deliberate and intentional attempt or threat to inflict physical injury upon another with force or strength when that attempt or threat is coupled with an apparent present ability to do so.... An assault may be committed by a defendant without actually touching, striking, or doing bodily harm to another.

Trial Transcript, vol. 4, at 113–14.

We can see how this wording, by defining the overall offense at issue as a threat to threaten to harm another, could confuse a jury and we believe that a more logical instruction, considering the offense in its entirety, probably ought to have been given. Even when we consider the supplemental instruction in the light of the instructions in their entirety, *see United States v. Femia*, 57 F.3d 43, 46 (1st Cir.1995), we believe that the instructions conflicted with the court's earlier instruction that a threat expressed an intent to inflict *bodily* harm. *Compare* Trial Transcript, vol. 4, at 84 ("A threat is a statement that expresses an intent to inflict bodily harm on someone."), *with id.* at 114 ("An assault may be committed by a defendant without actually touching, striking, or doing bodily harm to another."). The instructions in their entirety may have had a tendency to confuse the jury regarding the definition of "assault" in the context of a threat to assault and the court's provision of such conflicting instructions was error. Because we are remanding on other grounds, we need not venture into the weighing necessary to determine whether any error in the instructions was harmless. It is sufficient that we note the potentially confusing nature of the instructions and the need to tailor them so as to avoid any such confusion.

### III. Evidentiary Issues

### A. Admission of Egan's testimony regarding the Oklahoma City bombing and subsequent bomb threats

Fulmer argues that the prejudicial effect of the following colloquy substantially outweighed any probative value and thus it should have been excluded under Federal Rule of Evidence 403.[3]

---

**3.** Federal Rule of Evidence 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice....

Q. Now, apart from what you knew and had learned about Kevan Fulmer, was there anything else that affected the way you interpreted the message that you received on April 25, 1995?

A. Yes.

Q. What was that?

A. There had been a series of recent events ... that involved threats to federal law enforcement officials and, in fact, a bombing of·the federal building in Oklahoma.

Q. And what did you understand about the bombing of the federal building in Oklahoma City?

 \* \* \* \* \* \*

THE WITNESS: I understand that 169 federal employees died.

Q. And when had the Oklahoma City bombing occurred in relation to your hearing the message on April 25?

A. One week before.

 \* \* \* \* \* \*

Q. And after the bombing in Oklahoma City of the federal building and the time that you heard the message, had anything happened in the interim that affected your interpretation of the statement?

 \* \* \* \* \* \*

THE WITNESS: I think we are at— yes, there were incidents in Oklahoma City that concerned me.

Q. Were those local incidents?

A. There had been a series of bomb threats and evacuations of buildings to include specific bomb threats to the FBI, bomb threats to the JFK Federal Building which is across the street which was evacuated, and a bunch of other ones around the city.

Q. Directed at different Government offices?

A. Yes.

Q. And had your own office, the FBI office, been evacuated because of the [sic] threat?

A. Yes.

Trial Transcript, vol. 2, at 113–15. The government referred to the bombing in both its opening statement and its closing argument. In the opening statement, the prosecutor stated that Fulmer's statement occurred

> just one week after someone apparently unhappy with the way the Federal Government was doing its business had killed hundreds of federal agents, federal employees, and civilians. And in the week after that threat, came threats near Boston to various federal buildings including the FBI Building, and the need to evacuate those buildings based on those threats.

*Id.* at 46. The government returned to this topic in its closing argument:

> One week after the Oklahoma City bombing, bomb [sic] that can turn the federal building out there into rubble, killing hundreds of federal law enforcement agents, employees and civilians, an event that so dominated the airways, it [was] almost the only thing in almost a year, [to] take the O.J. Simpson trial off the page.

*Id.,* vol. 4, at 41.

 We review a trial court's on-the-spot weighing under Rule 403 for abuse of discretion, reversing only in extraordinarily compelling circumstances. *United States v. Lewis,* 40 F.3d 1325, 1339 (1st Cir.1994). The district court admitted the evidence as "relevant to the agent's state of mind at the time he received the communication and to why he might have considered it threatening." Order on Motions in Limine, October 24, 1995, at 2. Fulmer challenges this assessment, arguing that, "[w]hile the context of a statement may well cast light on its meaning, that fact does not permit, without limitation, any and all facts to be bootstrapped into the trial." Appellant's Brief at 28. The government, on the other hand, argues that the testimony was properly admissible as evidence of the context in which Fulmer's statement was made. The government suggests that there was no risk of prejudice to Fulmer because "there was no suggestion of, and no serious risk that the jury would infer, any link between Fulmer and the Oklahoma City bombing." Appellee's Brief at 29. We agree with Fulmer.

The probative value of this evidence was, at best, slight. Fulmer's "silver bullets"

statement did not make reference to Oklahoma City, bomb threats, or the use of bombs or any other type of explosive. The statement could not be read as related to the events that took place in Oklahoma City, nor to the bomb threats in Boston. True, such evidence may have shed light on what the person making the statement reasonably should have foreseen. The danger of unfair prejudice, however, is tremendous. Undue focus on evidence of the Oklahoma City bombing and resulting deaths, as well as subsequent bomb threats and evacuations, serves only to evoke an improper emotional response from the jury, distracting the jury from careful consideration of the relevant issues before it and thereby prejudicing Fulmer. While some reference to the bombing may have been permissible, the scope of the evidence admitted constituted an abuse of discretion.

We turn to consider whether the error was harmless. "In determining whether or not error was harmless, a reviewing court must assess the record as a whole to determine the probable impact of the improper evidence upon the jury." *United States v. Melvin*, 27 F.3d 703, 708 (1st Cir. 1994) (citation and quotation marks omitted). "An error will be treated as harmless only if it is 'highly probable' that the error did not contribute to the verdict." *Id.* Considering all of the evidence submitted in this trial, including other improperly admitted evidence, *see infra* sections III.B. & III.C, and the fact that Fulmer's statement is certainly not without ambiguity, we cannot find that reference to the Oklahoma City bombing to be harmless. *See Melvin*, 27 F.3d at 708; *see also United States v. Sepúlveda*, 15 F.3d 1161, 1182 (1st Cir.1993) ("[A] harmlessness determination demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that error affected the factfinder's resolution of a material issue.").

## B. Admission of actual bullets

During a pre-trial conference, the government sought permission to introduce bullets obtained from Egan to rebut Fulmer's suggestion that a silver bullet is a solution to a problem. The district court allowed the introduction of four .38 caliber bullet taken from Egan's desk and two 9–millimeter bullets taken from his handgun, instructing the jury that the ammunition was admitted

> to demonstrate what it is Mr. Egan had in his desk drawer. *So far* there is no evidence in this case that the defendant knew anything about this exhibit at all.

Trial Transcript, vol. 2, at 104 (emphasis added).

On appeal, Fulmer contends that the district court's admission of this ammunition was "grossly improper." He argues that the introduction of these bullets could not have assisted the jury in understanding the phrase "silver bullets," that the court's suggestion that they were offered "to demonstrate what … Mr. Egan had in his desk" bears no relevance to any issue in the case, and that the presence of live ammunition in the jury room only served to inflame the jury and provoke an improper response.

The government supports the admission of the bullets as a means of showing that a reasonable person would interpret the term "silver bullets" to mean actual bullets that are silvery in color. The government suggests that there was no danger of prejudice here because the bullets were clearly identified in the limiting instruction as belonging to Egan rather than Fulmer. We find this distinction unconvincing.

The probative value of actual bullets in this case is minimal. If the jury were in need of the suggestion that actual bullets may be silvery in color, a proposition that we find dubious, the government could have presented testimonial evidence to that effect. The introduction of ammunition was certainly unnecessary. We also find that the risk of prejudice or confusion to the jury substantially outweighed any minimal probative value this evidence may have had. Notwithstanding the district court's admonition that the ammunition was intended to show what

was in Egan's desk, the jury may have been confused as to the significance and role of the ammunition in this threats case.[4] Furthermore, more central to the issue of the relevancy of this evidence and, consequentially, to its potential to unduly influence the jury improperly, we fail to see what possession by the *victim* of these bullets has to do with whether the defendant's statement constituted a threat, particularly since he was unaware of their existence.

■ In light of the entire case and the significance of actual bullets in evidence, we cannot find that this error was harmless. *See supra* Section III.A; *see also Melvin,* 27 F.3d at 708 ("An error will only be treated as harmless if it is 'highly probable' that the error did not contribute to the verdict.").

### C. Admission of evidence regarding Agent Egan's reactions to the telephone message

Fulmer contends that the district court made various errors in allowing Egan to testify about his reaction to Fulmer's voicemail message. During this testimony, Egan stated that he believed that Fulmer's initial pleasantries were "dripping with sarcasm." He also indicated that he believed Fulmer's reference to "misprision of a felony" meant that Fulmer believed Egan had committed the crime of misprision by failing to pursue the case against Fulmer's family. Egan stated that he interpreted Fulmer's use of the term "silver bullets" as a death threat. Egan testified that he found the message "chilling" and "scary," and that he was "shocked, couldn't believe he would do it." Trial Transcript, vol. 2, at 97. In response to the question, "Did you do anything different in going home that night than you ordinarily did," Egan responded that he "[t]ook some comfort out of the fact that I could hear an extra magazine. There was an extra magazine in my car, and I took some comfort out of the fact that it was in there." Fulmer's trial counsel objected that the statement was both nonresponsive and should have been excluded under Federal Rule of Evidence

403. The district court overruled the objection, and Egan continued to testify:

Q. Special Agent Egan, what do you mean there was an extra magazine in your car?

A. Magazine is for ... my semiautomatic pistol, held an extra 18 rounds.

Q. A magazine is something that holds an extra 18 rounds of ammunition—

A. Yes.

Q. —that was in your car that night after you heard the message?

A. I could hear it rattling. It was in the glove box.

*Id.* at 98.

On appeal, Fulmer raises three arguments regarding this testimony. First, he claims that such reaction evidence is not relevant to determining whether, under an objective standard, Fulmer made a threat. Second, Fulmer objects to portions of Egan's testimony in which he interpreted each portion of the message. Third, Fulmer claims that even if it were relevant, the reaction evidence was unfairly prejudicial.

Those circuits that have considered the issue have found evidence of the recipient's reactions to the alleged threat relevant to the determination of whether the statement is a "true threat." *See Malik,* 16 F.3d at 49 ("In making this determination, proof of the effect of the alleged threat upon the addressee is highly relevant."); *United States v. Roberts,* 915 F.2d 889, 890–91 (4th Cir.1990) (noting that evidence of recipient's state of mind and actions taken in response are relevant to determination of true threat); *Schneider,* 910 F.2d at 1571 ("The fact that the victim acts as if he believed the threat is evidence that he did believe it, and the fact that he believed it is evidence that it could be believed and therefore that it is a threat. By this chain of inference, the relevance of the [recipient's] testimony is established."); *Orozco–Santillan,* 903 F.2d at 1265 ("Alleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners."); *United States v. Davis,* 876 F.2d 71, 72 (9th

---

**4.** We note as well that the limiting instruction carried the risk of confusing the jury by suggesting that evidence that Fulmer knew of the bullets in Egan's drawer would be forthcoming.

Cir.1989) ("A recipient's state of mind, as well as his actions taken in response to the letter, are highly relevant in establishing ... whether the letter could reasonably be read as containing a threat of injury."); *Maisonet*, 484 F.2d at 1358 ("Whether a letter that is susceptible of more than one meaning—one of which is a threat of physical injury—constitutes a threat must be determined in the light of the context in which it was written.").

 Moreover, in the context of an attempted extortion case, we have held the recipient's reactions to a threat to be relevant and admissible. *United States v. Goodoak*, 836 F.2d 708, 712 (1st Cir.1988). We determined that the "state-of-mind evidence will be most relevant to th[e] question [of whether there was an attempt to frighten] where the defendant knew or reasonably should have known that his actions would produce such a state of mind in the victim." *Id.* Thus, even when, in the extortion context, we have employed the legal standard advocated by Fulmer—determining a "true threat" from the perspective of the person who makes the statement—we have found that evidence of the effect of the threat upon its listener is relevant to what a reasonable person in the position of the speaker should have foreseen. Therefore, although the proper standard is what a person making the statement should have reasonably foreseen, we find that evidence of the recipient's reactions is relevant to that inquiry. Because Egan's interpretation of the message provided the basis for his reactions thereto, it is also relevant under the same analysis as his reaction and was properly admitted.

Fulmer further contends that, even if Egan's reaction is relevant, its relevance was substantially outweighed by its prejudicial impact and it should have been excluded. It is well established that "[i]f the evidence brings unwanted baggage, say, unfair prejudice or a cognizable risk of confusing the jury, and if the baggage's weight substantially overbalances any probative value, then the evidence must be excluded." *United States v. Rodríguez–Estrada*, 877 F.2d 153, 155 (1st Cir.1989). We recognize that all evidence mustered by the government is meant to prejudice the defendant. Rule 403 is meant only to exclude that evidence that poses a danger of *unfair* prejudice. *United States v. Wood*, 982 F.2d 1, 4 (1st Cir.1992).

 The actual recipient's reaction to the statement shows that the recipient did perceive the message as a threat. This reaction is probative of whether one who makes such a statement might reasonably foresee that such a statement would be taken as a threat. On the other side of the equation, any prejudice, let alone unfair prejudice, did not substantially outweigh the probative value of much of the proffered evidence. Egan's reaction to and interpretation of the message did not infect the proceedings with unfair prejudice.

 The weighing of Egan's testimony regarding the extra magazine of ammunition "rattling" around in his glove compartment, however, is a closer call. Although this evidence may have been probative of Egan's reaction to receiving Fulmer's message, and may have indicated the extent of Egan's fear, there is a risk that it may also have aroused an emotional or biased response in the jury that may have confused the issues in the case. This risk was increased by the government's mischaracterization of Egan's testimony in its closing, when it erroneously stated that Egan made sure to take home an extra eighteen rounds of ammunition the night he received the message. Finally, the prejudicial effect of this testimony is compounded when we view it in light of the contested evidence discussed in sections I.A and I.B. We find that its use could have evoked an emotional response in the jury, and that this likely prejudicial effect substantially outweighed any probative value. We find the district court abused its discretion by admitting evidence as to the ammunition carried by Egan on the night he received the threat.

### D. Admission of discussion between Egan and his supervisor

Fulmer next contests the introduction of testimony from both Egan and his supervisor, Schlabach, regarding a conversation that took place between them the morning after Egan received the message. Egan testified

that he played the tape for Schlabach, and told Schlabach that he thought the message was a threat and intended to bring it to the attention of the United States Attorney.

Schlabach testified that Egan said that he considered the message a threat, particularly the statement "[t]he silver bullets are coming for you."[5] Schlabach stated that Egan was "clearly upset, concerned, agitated. His motions were somewhat exaggerated. Typical reaction you would see under those circumstances." Trial Transcript, vol. 2, at 130. Schlabach indicated that Egan intended to discuss the message with the United States Attorney's office and with a squad in the FBI unit responsible for investigating threatening matters.

In a pre-trial conference, the district court ruled that these statements were admissible as either statements of present sense impression or of then-existing state of mind. *See* Fed.R.Evid. 803(1), 803(3). Fulmer argues that the district court misinterpreted and/or misapplied these two hearsay exceptions. He further argues that the introduction of this testimony was grossly prejudicial because it emphasized Egan's conclusion on the ultimate issue, that the statement was a threat, and should have been excluded on those grounds.

We have already noted that a victim's reactions and actions taken in response to an alleged threat are relevant to the determination of whether a statement is a "true threat." *See supra* section I.C. The statements made by Egan in the context of this conversation are not offered for the truth of the matter asserted, that the statements were a threat and that Egan would bring the message to the attention of the United States Attorney's office. Rather, Egan's statements relate to the nature and extent of the impact of Fulmer's statement upon Egan. They, thus, are not hearsay.

Regarding Schlabach's testimony, we find that his testimony as to Egan's statements are cumulative and that his comments regarding Egan's demeanor during the course of this conversation were not hearsay at all. The district court did not err in admitting this evidence.

### E. Admission of bad character evidence

Egan testified at trial that, at their first meeting, Fulmer indicated that Boschetti and David Fulmer "had used the courts against him, ... to keep him away from the family." Trial Transcript, vol. 2, at 59–60. Egan also testified that Fulmer told Egan that he had been restrained from seeing his family by the court. *Id.* at 108–09. Egan further testified that Boschetti informed him that Fulmer's allegations were "vengeance" on Fulmer's part. *Id.* at 77. Egan stated that David Fulmer told Egan that "this is the last episode in a continuing series of hard feelings between Kevan Fulmer and his family." *Id.* at 79.

Fulmer first contends that these statements were hearsay. We agree with the district court's assessment that these statements were not hearsay, but were offered to show the context in which Fulmer's statement was made.

Fulmer also contends that introduction of both his own statements and those of others violates Federal Rules of Evidence 404(b),[6] because the acts mentioned had a tendency to show a propensity toward bad acts, and Rule 403, because the prejudicial effect of the evidence substantially outweighed its probative value. Rule 404(b) is intended to "forbid judging a person on the basis of innuendo arising from conduct [that] is irrelevant to the charges for which he or she is presently standing trial, *i.e.*, against finding present guilt based on a 'bad character profile.'" *United States v. Cortijo–Díaz*, 875 F.2d 13, 15 (1st Cir.1989). We employ a two-pronged test to determine whether evi-

5. The actual statement in the message was "[t]he silver bullets are coming."

6. Federal Rule of Evidence 404(b) provides:
 Other crimes, wrongs, or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, preparation, plan, knowledge, identity, or absence of mistake or accident.

dence of a defendant's "other acts" is admissible.

First the evidence must overcome the "absolute bar" of Fed.R.Evid. 404(b) by being specially probative of an issue in the case—such as intent or knowledge—without including bad character or propensity as a necessary link in the inferential chain. Probative value "must be considered in light of the remoteness in time of the other act and the degree of resemblance to the crime charged." If the proffered evidence has "special relevance," it is nonetheless inadmissible if its probative value is "substantially outweighed by the danger of," inter alia, "unfair prejudice, confusion of the issues, or misleading the jury."

*United States v. Frankhauser*, 80 F.3d 641, 648–49 (1st Cir.1996) (citations omitted).

■ We find first that the evidence did have "special relevance" to an issue in this case, namely, whether a person making the statement should have reasonably foreseen that his statement, viewed in light of the factual context in which it was made, was a "true threat." Whether Fulmer's family relationship was strained, whether he had been restrained from seeing his family, whether he harbored ill feelings toward his former father-in-law and brother—all of these things are especially relevant to understanding Fulmer's motivation in his pursuit of sanctions against his former family and perhaps the extent of his potential disappointment at the government's failure to prosecute Boschetti and David Fulmer. We find that the district court did not abuse its discretion in finding that this evidence fell outside the prohibitions of Rule 404(b) because the evidence could go both to Fulmer's possible motive and to his intent to threaten Egan.

■ Under Rule 403, the district court is to exclude evidence that creates unfair prejudice or a risk of confusing or misleading the jury that substantially outweighs any probative value. *Id.* at 649. Certainly evidence that Fulmer had engaged in other acts that might show that he has a tendency to be

violent or vengeful are prejudicial. The question is whether this prejudice is unfair. In a threats prosecution, the general factual context in which the statement was made bears significantly on whether an ambiguous statement could reasonably be read as a threat. Given that the interaction between Fulmer and Egan is related directly to Fulmer's relationship with his family, indeed that their interaction arose from that relationship, admitting evidence regarding the family relationship was not likely to unfairly prejudice Fulmer and any prejudice certainly did not substantially outweigh any probative value.

The district court was careful to exclude other evidence of Fulmer's prior acts as overly prejudicial. Given the district court's careful weighing of the "other acts" evidence, we find no abuse of discretion here.[7]

■ One nuance of Fulmer's argument remains. While Fulmer concedes that the context of a statement is relevant to the inquiry under the objective standard of a "true threat," he contends that the evidence should focus exclusively on the context of the statement itself and on the interaction between the parties to the statement, here Fulmer and Egan. He maintains that any evidence from sources other than Fulmer are not relevant to the inquiry under the objective standard. We find that the evidence of Fulmer's other acts from sources other than Fulmer so closely mirrors statements from Fulmer to Egan that it is cumulative of Fulmer's statements. We find that, if their admission was error, that error could not have been anything other than harmless. *United States v. Cudlitz*, 72 F.3d 992, 999 (1st Cir.1996) ("Under the harmless error doctrine ... we are instructed to ask whether it is 'highly probable' that the error did not 'contribute to the verdict.'" (citations omitted)).

### F. Government's admission of newspapers that depicted murders, shootings, and threats

■ On direct examination, Erika Liem, a paralegal in defense counsel's office, testi-

---

7. Fulmer argues that evidence that he had been arrested for or even convicted of assault was improperly placed before the jury. Fulmer fails to cite where in the transcript such evidence may be found. Having reviewed the trial transcript as well as the trial exhibits, we find no indication that such evidence was placed before the jury.

fied that she had found only one article in a search of both the Boston Globe and the New York Times for 1995 in which the term "silver bullets" referred to actual ammunition. She further testified that, in several of the articles, "silver bullets" referred to a solution to a problem. On cross-examination, the government asked Liem whether she had found several articles, in which the phrase "silver bullets" appeared, that depicted murders and shootings. She testified that she had not found these articles, all of which were from newspapers outside the Northeast and all but one of which were published before 1995. The prosecutor then read a sentence from one of the articles and asked Liem about other facts discussed in the article. Each of the articles was admitted into evidence. On redirect-examination, defense counsel introduced into evidence the articles found in Liem's search.

On appeal, Fulmer contends that the government's use of these articles was outside the scope of the use of the phrase "silver bullets." The government responds that the evidence was proper rebuttal to Fulmer's implication that the term typically is used in a benign manner. We find that, because Fulmer opened the door to introducing evidence from newspapers reports of the different usages of the term "silver bullets," the court did not abuse its discretion by allowing the government to provide evidence from similar sources to rebut Fulmer's evidence.

## CONCLUSION

This appeal presents a variety of claims of error, most of which concern difficult decisions made by the district court that we are wary to reverse. We find, however, that three evidentiary rulings by the district court were errors that cannot be deemed harmless because of the unacceptable risk of unfair prejudice they created. Specifically, we find that the district court erred in admitting into evidence: actual bullets; testimony regarding ammunition in Egan's car on the night he received the alleged threat; and testimony regarding the Oklahoma City bombing. Therefore, Fulmer's conviction is *vacated* and the case *remanded* for further proceed-

ings consistent with the discussion in this opinion.