# United States Court of Appeals
## For the First Circuit

No. 20-1654

UNITED STATES OF AMERICA,

Appellee,

v.

MATTHEW OLIVER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Barron, Circuit Judges.

Zainabu Rumala, Assistant Federal Public Defender, on brief for appellant.
John J. Farley, Acting United States Attorney, and Seth R. Aframe, Assistant United States Attorney, on brief for appellee.

December 1, 2021

**SELYA**, <u>Circuit Judge</u>.  A bit of doggerel, popular with past generations of children, suggests that "sticks and stones may break my bones, but words will never harm me."  Under certain circumstances, though, words threatening physical harm may violate federal criminal law; provided, however, that the speaker knows well enough how his words are likely to affect his target audience.  This case illustrates the point:  defendant-appellant Matthew Oliver was indicted by a federal grand jury sitting in the District of New Hampshire on two counts of mailing threatening communications through the United States Postal Service, <u>see</u> 18 U.S.C. § 876(c), and convicted on both counts following a trial.  He now appeals, arguing that no rational jury could have found him guilty beyond a reasonable doubt.  After careful consideration, we affirm.

## I. BACKGROUND

We rehearse the relevant facts, recounting them in the light most hospitable to the jury's verdict.  <u>See</u> <u>United States</u> v. <u>Fuentes-Lopez</u>, 994 F.3d 66, 71 (1st Cir. 2021).  We then sketch the travel of the case.

In January of 2017, the defendant — while jailed in New York on a cluster of unrelated state charges — wrote a letter to his stepmother, Linda George, and mailed it to her at her address in New Hampshire.  For ease in exposition, we refer to both Linda George and her adult daughter, Ryan George, by their first names.

The letter surprised Linda when it arrived: both she and Ryan had renounced their relationships with the defendant several years earlier (after they had developed concerns about his mental health). The contents of the letter reinforced these concerns. Although much of the letter rambled, its more lucid segments laid out a series of grievances against Linda. These grievances ranged from complaints about what the defendant perceived to be his property rights to complaints about his health insurance. Of particular pertinence for present purposes, the defendant wove his grievances within a web of threatening language. In addition, the letter contained some bizarre references, such as an allusion to the defendant's self-proclaimed transition from his previous identity to "Satan, [i]n the form of Lucifer."

The letter upset Linda and left her concerned for both her safety and the safety of her daughter. Linda's fear — amplified by her prior experience with what she described as the defendant's "disturbing behavior" — impelled her to take the letter to her local police department in Seabrook, New Hampshire. She spoke with Officer Golden Tyre, who (after a preliminary inquiry) advised her that the defendant remained in custody in New York and did not appear to pose an immediate threat to her safety. Although this news partially allayed Linda's anxiety, she later secured a protective order against the defendant from a local court.

In April of 2017, another letter from the defendant arrived in Linda's mail. This letter was addressed to Ryan. Much like its predecessor, the second letter was rife with hostile language and weird satanic invocations. It also conveyed a sexually explicit threat that left Ryan worried about her physical safety. Finding the defendant's second letter "very disturbing," Linda delivered a copy to Officer Tyre and told him about the restraining order she had obtained.

In due course, the Seabrook police department sent copies of both letters to the Federal Bureau of Investigation (FBI). Following an investigation by the FBI, the grand jury indicted the defendant on the charges described above.

The travel of the case can be succinctly summarized. The defendant pleaded not guilty and did not seek to interpose any defenses based on either insanity or diminished mental capacity. A jury was empaneled and a one-day trial ensued. After the government presented its case in chief, the defendant moved for judgment of acquittal. See Fed. R. Crim. P. 29(a). He argued that the government had failed to produce sufficient evidence to establish the elements of the charged crimes. The government opposed the motion, and the district court reserved decision.

The defendant then indicated that he intended to waive his right to testify. As part of its inquiry into whether the defendant's proffered waiver was knowing, voluntary, and

intelligent, see Lema v. United States, 987 F.2d 48, 52-53 (1st Cir. 1993), the district court sought clarification surrounding the defendant's mental health. The defendant informed the court that he took an antipsychotic medication to treat bipolar depression and that he had been committed to institutions three times, but that he presently had full control of his mental faculties. Along the same line, his attorney unequivocally assured the court that he harbored no doubts as to the defendant's competency either to stand trial or to waive his right to testify.[1] Satisfied with the fruits of this exchange, the district court accepted the defendant's waiver.

In short order, the defendant rested without presenting any evidence. He proceeded to renew his motion for judgment of acquittal. See Fed. R. Crim. P. 29(c). The district court again reserved decision and submitted the case to the jury, which found the defendant guilty on both counts.

---

[1] This was not the district court's first inquiry into the defendant's competency. The court and the parties discussed the subject during a pretrial detention hearing. The record of that hearing suggests that the defendant underwent multiple court-ordered competency evaluations while he awaited trial in New York on unrelated state charges. Although those evaluations produced varying results, the charges eventually were dismissed (partially because of the length of time that the defendant already had been detained and partially because of concerns about the defendant's competency). In the end, the defendant and the government agreed — and the district court accepted — that the defendant was competent to stand trial on the federal charges.

The defendant again moved for judgment of acquittal, see id., and also moved to dismiss the charges against him based on allegations of prosecutorial misconduct. The district court denied both motions.[2] With respect to the defendant's Rule 29(c) motion, it concluded that the evidence sufficed to permit a rational jury to find the defendant guilty on both of the charged counts. The court subsequently imposed a fifteen-month term of immurement on each count, to run concurrently, followed by a two-year supervised release term. This timely appeal ensued.

## II. ANALYSIS

We review the district court's denial of the defendant's motion for judgment of acquittal de novo. See United States v. Kilmartin, 944 F.3d 315, 325 (1st Cir. 2019). The prism through which we review sufficiency-of-the-evidence challenges is familiar: we scrutinize the evidence in the light most hospitable to the jury's verdict, draw all reasonable inferences to the government's benefit, "and ask whether a rational jury could find that the government proved all the elements of the offense[s] beyond a reasonable doubt." Fuentes-Lopez, 994 F.3d at 71. In making this determination, we place "no premium . . . upon direct as opposed to circumstantial evidence; both types of proof can

---

[2] Inasmuch as the defendant does not renew his claim of prosecutorial misconduct on appeal, we have no need to describe in any detail either his motion to dismiss or the district court's ruling on that motion.

adequately ground a conviction." United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992).

Under this standard of review, it is not our prerogative to make independent assessments of witness credibility. See United States v. Andújar, 49 F.3d 16, 20 (1st Cir. 1995). Rather, we must "resolve[] all credibility issues in favor of the verdict." Id. To uphold a conviction, we need only ascertain that the verdict "finds support in 'a plausible rendition of the record.'" United States v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993) (quoting Ortiz, 966 F.2d at 711).

Here, both counts of conviction are premised on the same statute. See 18 U.S.C. § 876(c). The elements of the charged crimes chart the course of our journey through the trial record.

The statute makes it a crime for a person "knowingly" to mail a communication by means of the United States Postal Service "addressed to any other person and containing . . . any threat to injure the person of the addressee or of another." Id. As the district court explained in its jury instructions, the government had to prove beyond a reasonable doubt — with respect to each count — that the defendant "knowingly caused the [United States] Postal Service to deliver" the letter in question; that the letter "contained a true threat to injure another person"; and that the defendant sent it either "with the purpose of issuing a true threat to injure another person or . . . with the knowledge that the

communication would reasonably be viewed as a true threat to injure another person."  Because the defendant neither objected to the district court's instructions below nor assigns error to them on appeal, we treat the instructions as the law of the case.  See Kilmartin, 944 F.3d at 328-29.[3]

As to each count of conviction, the defendant challenges the sufficiency of the evidence only with respect to the third element of the offense.  The defendant's chief contention is that the letters only "made clear his intent to wage psychological warfare," not to inflict physical harm.  Therefore, he contends, no rational jury could find that he knew (let alone intended) that either Linda or Ryan would understand his letters to contain true threats of bodily harm.  The government demurs:  it submits that the "evidence was ample to support the jury's conclusion that the

---

[3] The district court's instructions are consistent with the Supreme Court's reading of a related, albeit distinct, statute in Elonis v. United States, which held that "the mental state requirement in [18 U.S.C.] Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat."  575 U.S. 723, 740 (2015).  Although this standard is in tension with our statement in United States v. Walker that the mens rea inquiry under section 876(c) is "whether the author reasonably should have foreseen that his message would be perceived . . . as a threat," 665 F.3d 212, 226 (1st Cir. 2011), Walker simply applied the legal standard agreed upon by the parties in that case and, in all events, was decided before Elonis.  Cf. Twitty v. United States, 577 U.S. 802 (2015) (vacating section 876(c) conviction and remanding for further consideration in light of Elonis); United States v. Mabie, 862 F.3d 624, 631-32 (7th Cir. 2017) (applying Elonis to section 876(c)).

defendant knew that his letters would be perceived by a reasonable person as a true threat."  We examine each letter separately to determine whether a rational jury could have found that the defendant knew that his statements would be interpreted as true threats of physical harm.

### A.  Count One.

The first count of conviction (count one) derives from the defendant's letter to Linda.  That letter included an ominous message:  "If I were you I'd tread carefully around town . . . and when I am done with you, you wont [sic] be able to walk let alone breathe until you die a moments [sic] notice from the day of my choice . . . ."  In the same letter, the defendant wrote that Linda would "<u>die</u> a thousand deaths or more in a land far, far away + in a time you do not follow" (emphasis in original).  Whether these statements comprised true threats was an issue of fact for the jury to determine.  See <u>United States</u> v. <u>Walker</u>, 665 F.3d 212, 226 (1st Cir. 2011); <u>United States</u> v. <u>Fulmer</u>, 108 F.3d 1486, 1492 (1st Cir. 1997).

Although much of the defendant's missive was rather cryptic, a jury reasonably could conclude — as this jury did — that the defendant's statements threatened Linda with physical harm.  See <u>Fulmer</u>, 108 F.3d at 1492 ("The use of ambiguous language does not preclude a statement from being a threat.").  Indeed,

Linda testified that she regarded the letter as threatening bodily harm.

The harder question is whether the defendant knew that his letter would be so interpreted. He argues that the letter, read as a whole, shows that his threats could not be taken to portend physical violence. He points out that the threats were part of a rambling, sometimes unintelligible diatribe about "Satan," "black magic[]," "Christian wicca," and other metaphysical forces. Additionally, the defendant suggests that certain language in the letter limited his threats to the enigmatic recesses of the psychic realm. For example, the letter tells Linda that the defendant is out "to destroy you psychically" and that he "will be sure to send a polite reminder as you sleep with my spirit body which exists solely to cause you pain and to suffer metaphorically." Given these expressions, the defendant says, no rational jury could have found that he knew that Linda would take his letter as a true threat of physical harm.

We do not agree. The evidence regarding the defendant's mental state consists of both the letter's text and his extrinsic commentary. Viewed in a vacuum, the letter's text is surely ambiguous: portions of its violent fantasies are explicitly denominated as psychic or metaphorical. And even though the letter does convey what clearly appears to be a death threat, it elsewhere predicts that Linda will "finally die of disease, possession of

the mind by spirits," or will be burned alive by a nearby Jewish-operated power plant.

Here, however, the letter did not stand alone. The jury also heard from the deputy sheriff who interviewed the defendant during his detention in New York after the letters were received. The deputy sheriff testified that in response to a question concerning the contents of the letters, the defendant "adamantly" insisted "that Linda should be worried and concerned for her safety." This admission supplies evidence from which the jury reasonably could infer the defendant's awareness that the letter would be interpreted by the recipient as a threat of bodily injury. See Kilmartin, 944 F.3d at 325 (explaining that reviewing court must consider both the evidence and "the plausible inferences therefrom"); Fulmer, 108 F.3d at 1493 (noting that jury is entitled to infer essential elements of the crime "from the circumstances surrounding the [threatening] statement[s]").

The binary conclusion that the government presented sufficient evidence to show both that the letter contained a true threat of physical harm and that the defendant knew that his letter would be so interpreted is not undermined by the defendant's purportedly exculpatory statements to the deputy sheriff. Although the defendant said that he did not intend to threaten Linda with physical harm in the letter — he suggested that the threats were "all in his head and not illegal" — the jury was under

no compulsion to credit these self-serving statements. As a general matter, a criminal jury is entitled, within wide limits, to doubt a defendant's statements regarding his motives and to credit a plausible alternative motive suggested by the government. See United States v. Nivica, 887 F.2d 1110, 1115 (1st Cir. 1989); United States v. Cintolo, 818 F.2d 980, 989 (1st Cir. 1987). This is such a case.

At any rate, the defendant's statements to the deputy sheriff go only to his intent, not to his knowledge. Even if he intended to refer only to a psychic attack taking place "in his head," he may nevertheless have known that Linda would not share this interpretation and would instead understand the letter to threaten her with bodily harm. On this record, the jury was free to reach such a conclusion and to find knowledge sufficient to establish the requisite mens rea under section 876(c).

To say more about count one would be to paint the lily. Taking the evidence in the light most hospitable to the jury's verdict — as the standard of review requires, see Ortiz, 966 F.2d at 711 — we conclude that the proof is sufficient to ground the defendant's conviction on count one. The district court, therefore, did not err in denying the defendant's Rule 29 motion as to that count.

## B.   Count Two.

We turn next to the second count of conviction (count two), which derives from the defendant's letter to Ryan.  In that letter, which was written after Linda had secured her restraining order, the defendant explicitly threatened Ryan with sexual assault and other injury, although some of the violence is qualified.  Pertinently, the defendant wrote:  "Now go home and cry like the wind and if I ever see you outside my door . . . again, I will rape you like a baby and kill you IN MY HEAD for food — in my mind — much like the time your mother did inside my mind . . . ."  In performing its factfinding function, the jury reasonably could have read past the letter's attempted qualifications and concluded that the letter contained a true threat to injure Ryan.  See Fulmer, 108 F.3d at 1492.

Once again, the defendant argues that he lacked the requisite mental state (either intent or knowledge) to support a conviction.  We agree that the letter's repeated characterization of certain of the defendant's threats as purely psychological, combined with its inherently delusional qualities, call into question the defendant's intent and/or his knowledge of how the letter would be interpreted.  The jury, however, had more evidence than the letter alone.  As we observed earlier, see supra Part II(A), the defendant's comment to the deputy sheriff that "Linda should be worried and concerned for her safety" lays the foundation

- 13 -

for an inference that he knew that his first letter would be received as a physical threat.

That same comment supports a parallel inference regarding his letter to Ryan. After all, the two letters were quite similar both in tone and in content. It was, therefore, fair for the jury to conclude that since the defendant knew that his first letter would be regarded as a physical threat, he must have known that his second letter would also be so regarded. See Ortiz, 966 F.2d at 711 (explaining that "juries are not required to examine . . . evidence in isolation, for 'individual pieces of evidence, insufficient in themselves to prove a point, may in culmination prove it'" (quoting Bourjaily v. United States, 483 U.S. 171, 179-80 (1987))). In the last analysis, "[c]hains of inference are a familiar, widely accepted ingredient of any process of ratiocination. This method of reasoning . . . should not be forbidden to a criminal jury." United States v. Spinney, 65 F.3d 231, 238 (1st Cir. 1995).

Drawing all reasonable inferences from the evidence in favor of the verdict, see Fuentes-Lopez, 994 F.3d at 71, the proof at trial supplied a plausible basis for a rational jury to find that the defendant sent the second letter with the requisite knowledge of how it would be perceived. While much of the evidence relating to the defendant's knowledge is admittedly circumstantial, that is not a fatal flaw. There is simply no

requirement that the government must adduce direct evidence to prove a defendant's mens rea in a criminal case.  See United States v. Floyd, 740 F.3d 22, 28 (1st Cir. 2014).

We need go no further.  Because the evidence sufficiently shows that the defendant sent his second letter with the requisite knowledge of how it would be interpreted, the defendant was not entitled to a judgment of acquittal on count two.  The district court, therefore, did not err in denying the defendant's Rule 29 motion as to that count.

## III. CONCLUSION

We do not gainsay that reasonable minds could differ as to the persuasiveness and force of the evidence adduced at trial. But in the first instance, weighing the evidence is the jury's task — and our review confirms that the evidence in this case, taken in the light most hospitable to the jury's verdict, is sufficient to support that verdict.  For the reasons elucidated above, the judgment of the district court is


**Affirmed**.