# United States Court of Appeals
## For the First Circuit

No. 22-1100

UNITED STATES OF AMERICA,

Appellee,

v.

LAVENEUR JACKSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch, Circuit Judge,
and Kelley,* District Judge.

Simon R. Brown, with whom Preti Flaherty PLLP was on brief,
for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom
Jane E. Young, United States Attorney, was on brief, for appellee.

January 23, 2023

* Of the District of Massachusetts, sitting by designation.

**BARRON, Chief Judge.** Laveneur Jackson appeals from his two September 2021 convictions in the United States District Court for the District of New Hampshire. Each conviction was for possessing a firearm as a prohibited person -- i.e., someone who has previously been convicted of a crime punishable by more than one year of imprisonment -- in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Jackson contends that the convictions must be reversed due to a lack of sufficient evidence. But, as a fallback, he contends that they must be vacated and the underlying charges dismissed due to governmental misconduct during the grand jury proceedings. We affirm.

## I.

## A.

At some point before December 23, 2016, Jackson asked Angelina Keenan to buy guns for him in exchange for money or drugs, and Keenan agreed to do so. And then, on that date, Jackson and Keenan traveled together to a gun store in Pelham, New Hampshire.

Jackson provided cash to Keenan for the purpose of purchasing a Ruger SR1911 pistol, which she did. To complete the purchase, she -- like all people who purchase a firearm from a federally licensed dealer -- was required to execute a form prescribed by the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF 4473 form"). Keenan left the store with the gun and then gave it to Jackson in the parking lot.

Four days after this first gun purchase, on December 27, Keenan made another purchase for Jackson following a similar pattern -- this time for two SCCY pistols at a gun store in Hooksett, New Hampshire. And, in January 2017, Jackson and Keenan again went to the Hooksett gun store together.

While the two were at that store, however, a store employee who had become suspicious of their behavior placed a call to law enforcement. A local police officer who had been deputized as a task-force officer for the ATF, Matthew Barter, as well as an ATF special agent, John Cook, responded to the call.

At some point after Barter and Cook arrived at the store, Cook began to question Jackson. Cook asked Jackson if he had a felony conviction, and Jackson responded in the affirmative. Cook then told Jackson that he was "in trouble" for handling guns in the store, and Jackson responded that he was not aware that it was illegal for a person who had been convicted of a felony to merely handle guns in a gun store.

Cook continued questioning Jackson, inquiring whether Jackson would be willing to help him recover any guns that he had previously acquired with Keenan's assistance. Jackson responded that the guns were in Massachusetts, that it would take some time, and that he would have to return some money to some people. After Cook suggested that they would need to "work together," Jackson

responded, "Yeah, I'm not going to do that," and indicated that he would like to speak to a lawyer.

Jackson then asked Cook if he could get $1,000 that he said that Keenan was "holding . . . for [him]." Cook at that point went over to Keenan to ask if she had Jackson's money. Keenan told Cook that she did have the money but indicated that $100 of it belonged to her as a "payment" for buying the guns that Jackson had asked her to purchase for him. Cook and Barter then seized the money.

Following this encounter, Jackson left the gun store. Keenan was taken to the local police department, where she was further questioned about the purchases.

**B.**

Nearly twenty months later, in August 2018, the government commenced grand jury proceedings to obtain an indictment against Jackson for violating the federal prohibition on gun possession by persons who have been convicted of a crime punishable by more than one year. See 18 U.S.C. §§ 922(g)(1), 924(a)(2).[2] The government called Cook to testify before the grand

---

[2] Section 922(g)(1) provides that "[i]t shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

jury about the January 2017 encounter between Jackson and Cook at the gun store.  The following exchange occurred during Cook's testimony:

> **Government:**  And just to clarify, [the January 2017] purchase was never consummated; right?
>
> **Cook:**  Right.  That's the day we show up and we stop it. . . .  So at this point, I move on to interviewing Jackson. . . .  And he said that he could get the guns back.  He would just have to return some money to some people and it would take some time.  I was like, "Hey, sounds great.  But we have to do that as a team, like we're going to work together so we can get those guns off the street."  And he's like, "Yeah, I'm not going to do that." And he invoked -- asked to talk to a lawyer at that point.
>
> **Government:**  And at that point you stopped questioning; right?
>
> **Cook:**  I stopped talking to him.
>
> **Government:**  One thing.  Before he asked to speak to a lawyer, before he stopped cooperating and talking to you, you had asked him where the firearms had gone; right?
>
> **Cook:**  Right.
>
> **Government:**  And he said they were in Massachusetts.
>
> **Cook:**  He did.  That's right.

---

Section 924(a)(2), at the time Jackson was charged, in turn provided that "[w]hoever knowingly violates subsection [(g)] of Section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both."  The statute has since been revised to provide for a penalty of up to 15 years of imprisonment for a violation of subsection (g).  See 18 U.S.C. § 924(a)(8).

**Government:** Okay. All right. At this point he invokes -- he says, "I want to talk to an attorney." And you stop questioning him; right?

**Cook:** Correct. Yes.

**Government:** But then he says something without you asking him any questions; right?

**Cook:** Right. So I basically told him, okay, you can go. And he said, "Well, you know, can I get my money from her?" And I was like, "What money?" And he was like, "She has $1,000 of mine." I was like, "Why does she have your money?" He said, "Well, she's just holding it for me." So I was like, okay. So I go over and I talk to Keenan. I'm like, "Do you have $1,000?" She goes, "Yeah, he gave me $1,000 to buy the guns." And then at that point she said, "$100 was for me, for payment for me for doing it, and the rest of the money was to buy the guns." So, you know, we just seized the whole $1,000 as evidence. We don't give it to anybody. ATF takes it into custody. We still have it in the evidence room.

**Government:** All right. And after this room -- after you seized the money, Jackson left the area; right?

**Cook:** Correct.

**Government:** He walked away.

**Cook:** That's right.

**Government:** And he was free to walk away because he wasn't under arrest.

**Cook:** Correct.

The government also sought during the grand jury proceedings to show through Cook's testimony that Jackson had

- 6 -

previously been convicted of a crime punishable by more than one year.  Cook's testimony in this regard was as follows:

> **Government:**    Is it fair to say that after [your] review of [Jackson's] criminal history, the last conviction you see on it is in December of 2013 for assault with a dangerous weapon?
>
> **Cook:**    That is one of the convictions I've seen on his criminal history.
>
> **Government:**    I'm sorry, I'm thinking of sentencing.  Actually, the last sentence that we see here is on July 30th of 2014; correct?
>
> **Cook:**    That's right.
>
> **Government:**    And that's for assault and battery on a police officer?
>
> **Cook:**    I have his last felony conviction --
>
> **Government:**    Resisting arrest?
>
> **Cook:**    -- possession to distribute.
>
> **Government:**    And possession --
>
> **Cook:**    Possession to distribute, two counts, on July 30th, 2014.  That was in the Lawrence District Court.
>
> **Government:**    A11 right.  Let's go with that. That's going to be Docket 118-CR-495?
>
> **Cook:**    58613 is what I have for the Lawrence District Court conviction.
>
> **Government:**    Okay. You have the -- okay. He was sentenced for several things on that date. But that is fair to say.  So, possession to distribute drugs?
>
> **Cook:**    Correct.

- 7 -

> **Government:** And July 30th of 2014 was the last sentence?
>
> **Cook:** Correct.
>
> **Government:** And it doesn't look like he had any probation. Just said one year; correct?
>
> **Cook:** I believe that's correct, yes.
>
> **Government:** So it's fair to say you don't know for sure.
>
> **Cook:** I don't know that for sure, no. I know that he has multiple felony convictions. I know that.

The grand jury returned an indictment alleging in two separate counts that Jackson, "who on or about September 3, 2013, was convicted in the Dorchester District Court in Massachusetts of Assault with a Dangerous Weapon, a crime punishable by imprisonment for a term exceeding one year, did knowingly possess" the Ruger SR1911 pistol and the SCCY pistols "on or about" the two dates in December 2016 that Keenan had purchased them. The indictment did not allege that Jackson had any other felony convictions.[3]

At a detention hearing after Jackson had been arrested on these charges, Jackson pointed out that the Dorchester, Massachusetts conviction for assault with a dangerous weapon that was identified in the indictment did not belong to him. The

---

[3] Jackson was also charged with two counts of aiding and abetting the making of a false statement in connection with the acquisition of a firearm, see 18 U.S.C. §§ 922(a)(6), 924(a)(2), but those charges were later dismissed by the District Court with prejudice.

government admitted after some further investigation that Jackson was correct on that score and thereafter commenced grand jury proceedings for the purpose of securing a superseding indictment.

During these grand jury proceedings, which took place in February 2020, the government again called Cook to testify. The following exchange occurred during Cook's testimony:

> **Government:** And Special Agent Cook[,] [w]ould you agree with me that [the colloquy from the 2018 grand jury proceedings] about [Jackson's prior felony] conviction was not particularly clear?
>
> **Cook:** Yes.
>
> **Government:** All right. So what the indictment originally said was a September 2013 Mass. conviction for assault with dangerous weapons; right?
>
> **Cook:** Correct.
>
> **Government:** What did further investigation reveal about that particular conviction?
>
> **Cook:** I don't know if that actually was a guilty conviction, that charge.
>
> **Government:** For Mr. Jackson?
>
> **Cook:** For Mr. Jackson, yes.
>
> **Government:** Have you since that time done additional research on Mr. Jackson's criminal history?
>
> **Cook:** Yes.
>
> **Government:** Can you explain to the Grand Jury what that investigation has determined?

- 9 -

> **Cook:** So when you get a criminal history report, a lot of times they don't actually have the disposition, you know, if they're actually found guilty or not guilty. So if you have a very lengthy criminal history, you actually have to reach out to the courts and request the court documents, go through the court documents to see if they were actually found guilty or not. So it's just not as clear-cut, so it took a little bit more digging. But what I found out is Mr. Jackson has been convicted of several felony offenses.

Cook then identified a July 2002 conviction for breaking and entering with intent to commit a felony in Springfield, Massachusetts, which he testified that he determined was Jackson's conviction through a fingerprint analysis. He also identified a drug-distribution conviction in Methuen, Massachusetts, which he similarly testified that he determined was Jackson's conviction through a fingerprint analysis.

The grand jury handed up a superseding indictment that alleges that Jackson, "knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess" the Ruger SR1911 and SCCY pistols "on or about" the dates in December 2016 that Keenan had purchased them. Jackson moved to dismiss the superseding indictment on the ground that the government prosecutor and agent Cook committed misconduct during the grand jury proceedings because they both knew that Cook's statement that "I don't know if [the September 2013 assault with a dangerous weapon] actually was a guilty conviction . . .

- 10 -

[for] Jackson" was false because they both knew at that time that the conviction was not Jackson's and failed to correct the false statement. Jackson also moved to dismiss the superseding indictment on the ground that in the course of the government's questioning of Cook about his interrogation of Jackson at the gun store, the government improperly characterized Jackson's invocation of his constitutional rights to counsel and to remain silent to the grand jury by describing the invocation as a cessation of Jackson's "cooperation."

The District Court held a hearing on both motions on August 17, 2021. Following the hearing, the District Court denied the motions.

## C.

A two-day jury trial was held in the District of New Hampshire on September 26 and September 27, 2021. Cook provided similar testimony at the trial to the testimony that he gave during the grand jury proceedings that resulted in the superseding indictment. The government also called employees of the gun stores that Jackson and Keenan had visited. In addition, the government introduced photographs of the firearms in question and certified copies of Jackson's Massachusetts Registry of Motor Vehicles documents, including his license photographs and other identifying information.

To establish that the guns in question had traveled in interstate commerce (i.e., the "interstate nexus element") the government called another ATF employee, special agent John Forte, who offered expert testimony about where the guns were likely manufactured. Forte testified that he reviewed the ATF 4473 forms that Keenan had executed at the gun stores to determine the manufacturers and serial numbers of the guns in question. He then testified that he reviewed certain reference materials -- including periodicals, books, online research, and notes gathered by other nexus examiners -- in connection with his research, although he did not name or testify to further details about those materials. Forte also testified that he reviewed a database that ATF maintains to determine whether the manufacturers had potentially worked with a subcontractor to produce the guns in question (the "variance database") and concluded that they had not.

Forte then testified that, based on these reviews, he determined that the Ruger pistol was manufactured in Prescott, Arizona, and the two SCCY pistols were manufactured in Daytona Beach, Florida. Forte further testified that he spoke to somebody at Ruger and was able to confirm that the Ruger pistol was in fact not manufactured elsewhere, and that he had "contacted SCCY" but could not remember "the details" about that outreach. He testified as well that "all of these things" are sources of

- 12 -

information that are reasonably relied upon by experts in his field.

Jackson moved to strike Forte's testimony on the grounds that Forte's opinions were not based on "scientific, technical, or other specialized knowledge" and that his testimony in this case was not the product of "reliable principles and methods." See Fed. R. Evid. 702. The District Court denied the motions.

At the close of the government's case-in-chief, Jackson moved for acquittal under Federal Rule of Criminal Procedure 29. Jackson argued in the motion that the prosecution had not met its burden of proving that Jackson was the perpetrator of the charged crimes, or that Jackson knew that he had been convicted of a crime punishable by more than one year of imprisonment. Jackson also argued in that motion that Forte's testimony must be stricken under the Federal Rules of Evidence and that, once stricken, the interstate nexus element could not be satisfied, such that a judgment of acquittal under Rule 29 would be warranted. The District Court took the Rule 29 motion under advisement and invited briefing on the issues that had been raised.

Jackson did not call witnesses of his own before he rested his defense. The jury returned a guilty verdict on both counts on September 28, 2021.

The District Court denied Jackson's motion for acquittal under Rule 29 in an endorsed order on November 18, 2021, and later

issued a published order explaining its reasoning on January 4, 2022. See United States v. Jackson, 578 F. Supp. 3d 240 (D.N.H. 2022). A few weeks later, on January 26, 2022, the District Court sentenced Jackson to 66 months of imprisonment, followed by 3 years of supervised release. Judgment of conviction entered on the same day. Jackson thereafter filed a timely notice of appeal.

## II.

We begin with Jackson's contention that his convictions must be reversed because the government failed to present sufficient competent evidence to prove the material elements of the charges that were brought against him.[4] We review a preserved challenge to a District Court's denial of a Rule 29 sufficiency motion de novo. United States v. Oliver, 19 F.4th 512, 516 (1st Cir. 2021). In conducting this inquiry, we must draw "all reasonable inferences from the evidence in favor of the verdict." Id. at 519 (citing United States v. Fuentes-Lopez, 994 F.3d 66, 71 (1st Cir. 2021)). That said, we must "reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." United States v. Rodríguez-Martinez, 778 F.3d 367, 371 (1st Cir. 2015) (internal quotations omitted).

---

[4] Jackson does not renew his challenge to the sufficiency of the evidence that he knew he had previously been convicted of a crime punishable by more than a year imprisonment, and we therefore do not address it on appeal.

- 14 -

**A.**

Jackson rests his contention that the District Court erred in denying his request to enter judgment of acquittal under Rule 29 in part on the ground that the government failed to identify him as the perpetrator of the charged offenses at trial. See United States v. Ayala, 289 F.3d 16, 25 (1st Cir. 2002) ("Identification of the defendant as the person who committed the charged crime is always an essential element which the government must establish beyond a reasonable doubt."). More specifically, Jackson argues that no rational juror could have found that Jackson was the perpetrator because no witnesses identified him in court and -- especially in light of the fact that he was masked during the entire trial -- the circumstantial evidence of his identity in those circumstances was insufficient.

But, we agree with the District Court that there was in fact an "in-court identification of Jackson as the person on trial." Jackson, 578 F. Supp. 3d at 250. Indeed, in the course of defense counsel's questioning of Cook, Cook was asked whether he could "tell by looking at [Jackson] today" whether Jackson was "heavier, the same, or thinner than he was" at the time of Cook's encounter with Jackson at the Hooksett gun store, and Cook responded: "[t]oday he's thinner," and then went on to further testify that he believed Jackson was the person who was depicted in surveillance footage from the Pelham store. See id.

In any event, we also agree with the District Court that "additional proof in the record supported the necessary link between the individual sitting in the courtroom and the individual named in the indictment." Id. at 250-51. For example, both the prosecution and defense counsel "referred to the defendant at trial" as the person involved in the alleged events, and the defense at no point objected to the references to the person in the courtroom at trial as "the defendant." See United States v. Weed, 689 F.2d 752, 755-56 (7th Cir. 1982).

We therefore see nothing that would have required the jury to rely on the type of "unreasonable, insupportable, or overly speculative" inference that would warrant acquittal in order to conclude that Jackson was in fact the perpetrator of the charged offenses. See Rodríguez-Martinez, 778 F.3d at 371. Accordingly, we reject this challenge to the denial of his Rule 29 motion.

**B.**

Jackson separately challenges the District Court's denial of his Rule 29 motion due to the District Court's asserted error in admitting the expert testimony of agent Forte, as Jackson contends that without that testimony the evidence did not suffice to show that the guns Jackson was charged for possessing traveled in interstate commerce. See 18 U.S.C. § 922(g)(1). The government does not dispute on appeal that, absent Forte's testimony, the record would not suffice to permit a rational juror

to find that the guns at issue traveled in interstate commerce. So, the key issue is whether Jackson is right that the District Court erred in not striking Forte's testimony under Federal Rules of Evidence 702 and 703.

Our review of the District Court's decision not to strike Forte's testimony is for abuse of discretion. Martínez v. United States, 33 F.4th 20, 27 (1st Cir. 2022). Under this rubric:

> embedded findings of fact are reviewed for clear error, questions of law are reviewed de novo, and judgment calls are subjected to classic abuse-of-discretion review. We will reverse a trial court's decision if we determine the judge committed a material error of law or a meaningful error in judgment. This occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them.

Id. (citations omitted).

**1.**

We begin with Jackson's contention that the District Court's decision to admit Forte's testimony violated Federal Rule of Evidence 702. The Rule provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the

trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court of the United States explained in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), that Rule 702 assigns a "gatekeeping role for the judge" to determine whether "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  But, although the district court's "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate," id. at 595, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert," Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Rather, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Id. That said, "[t]hat 'the factual underpinning of an expert's opinion is weak' is 'a matter affecting the weight and credibility of the testimony -- a question to be resolved by the jury.'"  Martínez,

33 F.4th at 24 (quoting Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 22 (1st Cir. 2011)).

Jackson does not argue to us that Forte -- as an ATF "interstate nexus examiner" -- lacked the type of specialized or technical knowledge or training necessary for someone to be "qualified as an expert." He also does not argue to us that Forte's testimony, if admissible, would not be "help[ful to] the trier of fact" -- i.e., that it is not "relevant." Fed. R. Evid. 702(a); see Martínez, 33 F.4th at 27.[5] Jackson contends instead that the government failed to show through Forte's testimony that his expert opinions in this case were "the product of reliable principles and methods," and that the government similarly failed to show through Forte's testimony that he "reliably applied the principles and methods to the facts of [Jackson's] case." Fed. R. Evid. 702(c), (d).

In pressing this contention, Jackson asserts that Forte's testimony about the sources and reference materials that he consulted to form his opinions was "extremely vague," "conclusory," and "non-specific." Jackson points in this regard

---

[5] In the District Court, Jackson also argued that Forte lacked the requisite "specialized" and "technical" knowledge to be qualified to offer expert opinion testimony under Rule 702(a), but the District Court rejected that aspect of the argument -- and Jackson does not renew it on appeal. See also United States v. Cortez-Oropeza, 40 F.4th 50, 55 (1st Cir.) (noting that this Court has "repeatedly . . . rejected similar arguments"), cert. denied, 143 S. Ct. 271 (2022).

to the fact that Forte did not specify in his testimony which periodicals, online materials, books, or other materials he consulted in reaching an opinion about the origin of the guns at issue here and also could not provide any details from his communications with Ruger and SCCY.

Jackson is right that Forte did not detail in his testimony which reference materials he reviewed as to each gun (with the exception of ATF's internal variance database). Jackson is also right that Forte could not recall details that he learned from his contact with Ruger and attempted contact with SCCY. And, Jackson is right as well that a review of prior cases rejecting challenges to the admissibility of expert testimony by an interstate nexus examiner reveals that the expert testimony offered in those cases more specifically detailed the precise reference materials relied upon by the interstate nexus examiner. See, e.g., United States v. Corey, 207 F.3d 84, 89-91 (1st Cir. 2000); United States v. Cormier, 468 F.3d 63, 72-73 (1st Cir. 2006).

But, we have accepted interstate nexus testimony predicated on an examiner's reference to the types of materials that Forte testified that he used -- including books, periodicals, online research, ATF databases, and notes compiled by other examiners. See Cormier, 468 F.3d at 72-73; see also, e.g., United States v. Cortez-Oropeza, 40 F.4th 50, 53 (1st Cir.), cert. denied,

143 S. Ct. 271 (2022). And, Forte did testify that he "ma[d]e the determination" as to the manufacturing location of the guns based on those types of materials, even if he did not specify which materials. Moreover, Jackson does not contend that those types of materials do not in fact contain the type of information that Forte would have needed to review to opine on where the gun was likely manufactured. We are therefore satisfied that the District Court did not abuse its discretion in ruling that Forte also reliably applied the principles and methods to the facts of the case. After all, where "the factual underpinning of an expert's opinion is weak" but the methods are otherwise found to be reliable, such an issue is "a matter affecting the weight and credibility of the [expert's] testimony" -- that is, "a question to be resolved by the jury." Martínez, 33 F.4th at 24 (quoting Milward, 639 F.3d at 22).

Jackson does invoke out-of-circuit authority that he argues supports his contention that Forte's testimony should have been stricken under Rule 702. But, it does not.

Although Jackson is right that the Ninth Circuit in United States v. Valencia-Lopez, 971 F.3d 891, 900-03 (9th Cir. 2020), relied on Rule 702 to overturn the decision by the district court there to admit expert testimony from a law enforcement officer, the panel in doing so emphasized that the expert had provided no explanation for his methodology in reaching his opinion

-- there, that there was "almost nil" possibility that a drug cartel would have tried to coerce the defendant in the manner that the defendant claimed that it did. See 971 F.3d at 900. Here, in contrast, Forte testified that he researched the particular guns that Jackson possessed based on the serial numbers that were reported on the ATF forms that he reviewed, and that he applied a methodology that has been repeatedly accepted by this Court as reliable to those guns.

Moreover, Jackson is right that in Coleman v. United States, No. 4:17-CV-2228, 2018 WL 1165726, at *4 (N.D. Ohio Mar. 6, 2018), the district court did express concern about the vagueness of the interstate nexus examiner's testimony concerning the "ATF database [and] ATF reports" that he had relied upon in reaching an opinion about the origin of the gun at issue. But, the district court ultimately relied in granting habeas relief on its separate finding that the expert failed to testify that other experts in the field "reasonably rely" on the type of materials that he used, see id. at *4, which implicates Rule 703 rather than Rule 702. And -- as we next explain -- there is no such Rule 703 problem in this case.

**2.**

We turn, then, to Jackson's contention that the District Court erred by not striking Forte's testimony pursuant to Rule 703, which provides: "An expert may base an opinion on facts or

data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  Fed. R. Evid. 703.

The District Court rejected this argument on the ground that its factual premise -- that Forte never testified that experts in his field regularly use the variance database -- is wrong. Jackson, 578 F. Supp. 3d at 254-55.  We agree with the District Court.

Forte testified that he always checks the variance database when he is conducting an interstate nexus analysis.  See id.  He went on to explain that he looked at his usual reference materials for this case, including to determine whether the manufacturers had "subcontracted [the manufacturing process] to some other manufacturer."  Id. at 255.  The government then asked: "all of the various things that you're looking at, are all of those reasonably relied upon by experts in the field?"  Forte responded, "yes."  Id.

The District Court interpreted Forte's affirmative response to this question as including the variance database, id., and that factual finding is not clearly erroneous.  As the District Court explained, the "prosecutor's question could quite reasonabl[y] have been understood as a catch-all that included the

variance database that Agent Forte had discussed just minutes prior." Id. It is also not otherwise clear from the record that Forte intended to exclude the variance database from the set of materials that he testified that other interstate nexus examiners rely upon. See id. As a result, the District Court supportably concluded that Forte's testimony "was based entirely on facts or data reasonably relied on by experts in his field." Jackson, 578 F. Supp. 3d at 256. Thus, like the District Court, we must reject Jackson's contention that the jury should not have been allowed to consider Forte's testimony related to the variance database.

## III.

We now turn to Jackson's fallback contention that his convictions must be vacated because the District Court abused its discretion in denying his motion to dismiss the superseding indictment on the ground that the government committed misconduct during the grand jury proceedings to obtain it. Jackson alleges two types of misconduct: first, that the government knowingly presented false information about Jackson's prior convictions and failed to correct it, and second, that the government improperly invited the grand jury to draw negative inferences from Jackson's invocation of his constitutional rights to remain silent and to counsel during his encounter with Cook. We conclude that the District Court did not abuse its discretion in declining to dismiss the indictments based on either ground.

- 24 -

**A.**

The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides in relevant part that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." This constitutional guarantee secures, among other things, the right of criminal defendants to "fundamental fairness" in the proceedings that are brought against them. United States v. Valenzuela-Bernal, 458 U.S. 858, 872 (1982); United States v. Anzalone, 923 F.3d 1, 5 (1st Cir. 2019).

This Court has recognized that while a "grand jury may consider incompetent evidence" presented by the government in the course of obtaining an indictment, a grand jury "cannot itself violate a constitutional privilege." United States v. Flaherty, 668 F.2d 566, 583 (1st Cir. 1981) (emphasis added) (citing United States v. Calandra, 414 U.S. 338, 346 (1974)). Among these privileges is a criminal defendant's right to fundamentally fair proceedings under the Due Process Clause. See United States v. Reyes-Echevarria, 345 F.3d 1, 4 (1st Cir. 2003); United States v. Giorgi, 840 F.2d 1022, 1030 (1st Cir. 1988).

Thus, we have recognized that where the government elicited false or misleading testimony in order to obtain an indictment, knew that the relevant testimony was false, and failed to correct the falsity, such that the government "distort[ed] the integrity" of the grand jury proceeding, Giorgi, 840 F.2d at 1030,

dismissal of the indictment may be warranted, see Reyes-Echevarria, 345 F.3d at 4. In any given case, however, "it is within the discretion of the trial court to dismiss an indictment if it is based on incompetent or illicit evidence" presented to the grand jury, and "[t]o a lesser extent, the court of appeals has the supervisory power to make similar dismissals." Flaherty, 668 F.2d at 583.

The parties are in agreement that our review of the District Court's denial of Jackson's motion dismiss on grounds of government misconduct in the grand jury proceedings is for abuse of discretion. See, e.g., United States v. Ramos-Gonzalez, 775 F.3d 483, 492 (1st Cir. 2015). The parties also appear to agree that if Jackson were right that the government committed misconduct during the grand jury proceeding, then he must still show that the violation prejudiced him. See Reyes-Echevarria, 345 F.3d at 4; United States v. Flores-Rivera, 56 F.3d 319, 328 (1st Cir. 1995) ("[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." (quoting Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988))). And, under that standard, Jackson must show that "the violation substantially influenced the grand jury's decision to indict, or [that] there is grave doubt that the decision to indict was free from the substantial influence

of such violations."  Bank of Nova Scotia, 487 U.S. at 256 (internal quotations omitted).[6]

Jackson argues that the District Court abused its discretion in declining to find that a violation of his constitutional rights occurred during the second grand jury proceedings because the government knew that Cook's testimony that "I don't know if [the September 2013 assault with a dangerous weapon] actually was a guilty conviction . . . [for] Jackson" was false and failed to correct the falsity, even though the false statement was made in front of the grand jury.  Jackson then argues that he was prejudiced because the grand jury must have been influenced by testimony about a non-existent conviction for assault with a deadly weapon -- "an especially inflammatory representation where the grand jury was being asked to indict Jackson for illegal, felonious possession of firearms."

---

[6] We note that Jackson concedes to us that we must apply the prejudice standard for "nonconstitutional error" articulated in Bank of Nova Scotia, 487 U.S. at 256, see Reyes-Echevarria, 345 F.3d at 4 (applying this standard to a similar challenge), notwithstanding that the grand jury misconduct challenges that he brings are predicated on what he contends are errors of constitutional magnitude, but cf. Bank of Nova Scotia, 487 U.S. at 256-58 (explaining that the Court was adopting the standard "at least where dismissal is sought for nonconstitutional error" and noting that "no constitutional error occurred during the grand jury proceedings" in the case).

We bypass Jackson's claim that the government elicited improper testimony and hold that he cannot show that he was prejudiced. See Reyes-Echevarria, 345 F.3d at 4.

To prove that Jackson was guilty of the underlying counts, the government needed to establish before the grand jury that Jackson had at least one prior conviction that was punishable by more than one year in prison. See 18 U.S.C. § 922(g)(1). Yet, Cook testified that the defendant had multiple felony convictions other than the one that undergirds Jackson's due process challenge, and Jackson does not contest the authenticity of those other convictions. Thus, even though -- as the District Court put it -- the government "engaged in a very sloppy presentation[7] that was difficult to follow," and even though the agent may have "made a statement about a prior conviction [that was] incorrect," we see no reason to think that the grand jury in issuing the superseding indictment (which does not refer to any specific previous convictions) did not rely on this "abundant" evidence of other prior felony convictions.[8] Nor does the precedent in this area

---

[7] We note that this was the government's second grand jury presentation. By choosing to read from the erroneous portions of the transcript of the first grand jury presentation, the government effectively repeated the misstep that led to the error in the original indictment.

[8] To be sure, Jackson may be right that there is potential for prejudicial harm when the government mistakenly references a violent felony offense like assault with a deadly weapon -- particularly in a firearms possession case -- but, such harm is

that Jackson marshals as support for a contrary conclusion provide it, as that precedent consists of one out-of-circuit district court ruling that is readily distinguished. See United States v. Cooper, 396 F. Supp. 3d 992, 95-96 (D. Kan. 2019) (dismissing indictment without prejudice due to the government's failure to correct a law enforcement officer's false testimony that a medical examination report contained evidence of sexual penetration, an essential element of the charged offense, when the report in fact did not).

**B.**

Jackson next contends that the government committed misconduct during the grand jury proceedings by prompting testimony from Cook that referenced Jackson's invocation of his constitutional rights and by characterizing the invocation as a cessation of Jackson's "cooperation" with law enforcement (rather than explaining to the jury that Jackson had every right to say what he did). The parties appear to agree that the same abuse of discretion and prejudice standards described above apply to this second misconduct-based claim.

To recap, the government called Cook to testify before the grand jury about his questioning of Jackson at the gun store in Hooksett, New Hampshire. Cook testified that after he had

---

minimized where, as here, the mistaken reference must be balanced against abundant evidence of multiple felony convictions.

asked Jackson to "work together" with him to "get those guns off the street," Jackson invoked his right to speak to an attorney, and that he thereafter "stopped talking to [Jackson]." The government then asked, "One thing. Before [Jackson] asked to speak to a lawyer, before he stopped cooperating and talking to you, you had asked him where the firearms had gone; right?" (emphasis added). Cook clarified that Jackson had told him that the guns were now in Massachusetts, and that it was then that Jackson had asked to speak to a lawyer. Cook then testified that Jackson asked -- without any prompting -- whether he could "get [his] money" from Keenan.

Jackson contends that the grand jury would have understood the government's statement that Jackson "stopped cooperating" as "obstinan[ce] instead of a lawful exercise of [his] constitutional right" (quoting United States v. Reeves, No. 11-520, 2012 WL 1909350, at *18 (D.N.J. May 25, 2012)). Even assuming that is true, though, Jackson by his own account still must show that that the government intentionally and improperly sought to invite the grand jury to draw a negative inference from the invocation of his rights. United States v. Lopez-Gutierrez, 83 F.3d 1235, 1245 (10th Cir. 1996); see also United States v. Barbour, 393 F.3d 82, 90 (1st Cir. 2004). And, considering the full context of the colloquy during Cook's grand jury testimony, we cannot conclude that the government's questioning and Cook's

reference to Jackson's invocation of his rights rose to the level of such intentional misconduct.

The District Court did conclude that the government's questioning could be seen to criticize Jackson's refusal to speak to Cook and that it would not allow such a reference at trial, but the sequence of questioning reveals that the government was more likely trying to show that Jackson freely offered additional incriminating information about the money that he had given to Keenan -- notwithstanding his own prior invocation of his rights. In other words, on this record, the manner in which the government referenced Jackson's invocation of his constitutional rights cannot be said to have constituted an impermissible attempt to infringe on the ability of the grand jury to exercise its own independent judgment under our precedents. We thus affirm the District Court's conclusion that "the colloquy on that issue was [not] serious enough to warrant the extreme remedy of the dismissal of the indictment."

## C.

Jackson's final contention is that the two alleged instances of government misconduct described above warrant dismissal when considered together even if neither does when considered on its own. That is so, Jackson contends, because "[i]n a felony firearms prosecution, introduction of a non-existent violent felony with a dangerous weapon conviction and

characterization of Jackson as a non-cooperator who sought a lawyer in the face of law enforcement questioning, in totality, biased the grand jury against Jackson in performing its fact-finding function."  But, Jackson's bare and speculative assertion that "the grand jury procedure was compromised" by the asserted cumulative misconduct does not amount to the required showing that the grand jury was substantially influenced by the alleged misconduct in its decision to indict.  See also Reyes-Echevarria, 345 F.3d at 4 ("All but the most serious errors before the grand jury are rendered harmless by a conviction at trial.").

## IV.

For the foregoing reasons, Jackson's two convictions are **AFFIRMED**.